* * * * * * * * * * *
The Full Commission has reviewed the prior Opinion and Award, based upon the record
of the proceedings before Deputy Commissioner Harris and the briefs and oral argument before the Full Commission. The appealing party has not shown good grounds to reconsider the evidence, receive further evidence, rehear the parties or their representatives, or amend the Opinion and Award except for minor modifications. Accordingly, the Full Commission affirms the Opinion and Award of the Deputy Commissioner.
 * * * * * * * * * * *
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. The parties are subject to the North Carolina Workers' Compensation Act. *Page 2 
2. An employee-employer relationship existed between Plaintiff and Defendant-Employer.
3. The carrier liable on the risk is correctly named above, and Defendant-Carrier came on the risk on September 1, 2004.
 * * * * * * * * * * * EXHIBITS
The following documents were accepted into evidence as stipulated exhibits by the Deputy Commissioner:
 • Exhibit 1: Executed Pre-Trial Agreement
 • Exhibit 2: Industrial Commission Forms, including Form 22
 • Exhibit 3: Letters from AIG Claim Services, Inc. and Defendant-Carrier
 • Exhibit 4: Plaintiff's medical records
 • Exhibit 5: Executed Compromise Settlement Agreement in "I.C. File Nos. 571146 and 571157"
 • Exhibit 6: DVD showing various jobs at Defendant-Employer's plant
Transcripts of depositions of the following were received post-hearing:
 • Dr. Allen Edwards
 • Dr. Robert W. Hart
 • Dr. Scott M. McCloskey
 • Dr. Jerry L. Barron
 * * * * * * * * * * * EVIDENTIARY RULINGS *Page 3 
The objections raised by counsel at the depositions taken in this matter are ruled upon in accordance with the law and the opinion in this Opinion and Award. * * * * * * * * * * *
Based upon all of the competent evidence of record and reasonable inferences flowing therefrom, the Full Commission makes the following:
 FINDINGS OF FACT
1. At the time of the hearing before the Deputy Commissioner, plaintiff was 54 years old. Her native language is Spanish and she speaks very little English. Plaintiff testified at the hearing through an interpreter.
2. Plaintiff has worked for Defendant-Employer for over 17 years, primarily as a lampshade assembler. As a lampshade assembler, Plaintiff attaches metal rings to the fabric of the lampshade utilizing a machine that, appears somewhat like a sewing machine, to apply tape that binds the rings to the fabric. She then uses scissors to cut the tape and must clean up the tape binding, which sometimes requires the further application of glue manually. The lampshades vary in size from very small to rather large, representative of the range of sizes typically found in a home.
3. The lampshade assembler position requires repetitive use of the hands and arms, with frequent extension of the arms at or above shoulder level from a seated position. The position also requires frequent use of scissors. Plaintiff works 40-45 hours per week, five days a week. Depending upon the size of the lampshades being assembled, Plaintiff may assemble up to 200 a day, fewer if she is working on larger lampshades.
4. Plaintiff began having symptoms of pain and numbness in her hands and arms several years ago. *Page 4 
5. On January 12, 2004, Plaintiff presented to Hart Industrial Clinic with symptoms in her elbows. She was diagnosed with right lateral epicondylitis. Plaintiff's symptoms improved with limited work duty, injections, medications and a splint. Consequently, by March 17, 2004, Hart Industrial Clinic noted that her right lateral epicondylitis was resolving, and Plaintiff was released with no follow-up planned.
6. Plaintiff filed a workers' compensation claim, alleging a date of onset of January 8, 2004 for her bilateral hands, arms and shoulders. The claim was assigned I.C. No. 571146. Commerce Industrial Insurance Company was the carrier on said claim, with AIG Claim Services, Inc. as the third-party administrator. Plaintiff ultimately settled said claim via the execution of a compromise settlement agreement on October 9, 2006.
7. After March 17, 2004, Plaintiff continued working in the lamp assembler job, and her symptoms worsened and expanded.
8. Defendant-Employer sent Plaintiff back to Hart Industrial Clinic on July 13, 2005. She presented with pain in both upper extremities from her hands to her shoulders, with significant numbness and tingling in her hands that worsened at night. Based on her history, examination and the results of nerve conduction studies obtained by Plaintiff's family doctor, Dr. Young, Plaintiff was diagnosed with mild bilateral carpal tunnel syndrome. The carpal tunnel syndrome was a new condition that had developed since Plaintiff was last seen in March of 2004. She was further diagnosed with upper extremity pain and paresthesias, with clinical evidence of tendonitis in both arms.
9. Following the July 13, 2005 doctor's visit, Defendant-Employer changed Plaintiff to a lamp assembly position, in which required Plaintiff to put parts together to assemble lamp bases and wire the lamps. This position was also repetitive and involved the frequent use of a *Page 5 
power screwdriver, wire cutters and pliers. Plaintiff did not experience relief from her symptoms while she was doing this job.
10. Plaintiff underwent a course of physical therapy over the next two weeks, but she was still having a lot of pain in her shoulders. Therefore, Hart Industrial Clinic referred Plaintiff for an orthopedic evaluation.
11. Plaintiff saw Dr. William Pekman on August 3, 2005 and September 8, 2005. Dr. Pekman injected both of Plaintiff's carpal tunnels, but the injections did not help her symptoms.
12. Defendant-Carrier stopped providing medical treatment to Plaintiff after her September 8, 2005 appointment with Dr. Pekman.
13. Plaintiff filed her Form 18 in the instant claim on or about October 26, 2005, alleging an onset date of July 11, 2005 for pain in both hands, arms and shoulders arising out of her repetitive work. She filed a Form 33 Request for Hearing on or about December 30, 2005. Defendants never filed a Form 61, and they did not file a Form 33R until the day of the hearing.
14. Although the instant claim number was set out along with I.C. No. 571146 in the caption of the agreement, the text of the agreement set out, in part, that "the payment recited herein is for all claims allegedly occurring during the period of coverage for Employer-Defendant by Commerce Industrial Insurance Company, Carrier-Defendant, and AIG Claim Services, Inc., Third-Party Administrator-Defendant, for their period of coverage prior to September 1, 2004, and is only intended to release the Defendants released herein. Employee-Plaintiff specifically reserves the right to pursue any claims against Employer-Defendant and any insurance carrier after September 1, 2004." Carrier-Defendant in the instant claim was not listed as a party to the agreement. *Page 6 
15. Plaintiff stayed in the lamp assembler position until sometime in 2006, then spent about two months making catalog corrections, which again was repetitive work involving the use of scissors and glue. Plaintiff's hands and arms continued to hurt while she did this job.
16. On September 15, 2006, Plaintiff went back to a lampshade assembler position. Her upper extremities continued to bother her.
17. Dr. Scott McCloskey, a neurosurgeon, first saw Plaintiff on October 23, 2006. Dr. McCloskey obtained MRIs of Plaintiff's shoulders and neck and diagnosed cervical disc disease at two levels, rotator cuff tears in both shoulders, bilateral carpal tunnel syndrome and bilateral tardy ulnar palsy, which involves the entrapment of the ulnar nerve at the elbow. Dr. McCloskey recommended that Plaintiff's shoulder conditions be addressed first, as they were the most severe problem.
18. Dr. Jerry Barron, an orthopedic surgeon, first saw Plaintiff on November 16, 2006 for her bilateral shoulder condition. Dr. Barron performed a diagnostic arthroscopy on Plaintiff's right shoulder on January 9, 2007. The procedure showed significant impingement of the acromion onto the rotator cuff, a partial rotator cuff tear, a tear of the superior labrum near the biceps tendon insertion, and acromioclavicular joint arthrosis. During the procedure, Dr. Barron removed a bone spur, debrided the rotator cuff and superior labrum and resected the distal clavicle. Based on the procedure and Plaintiff's history and symptoms, Dr. Barron suspects that Plaintiff would have similar findings in her left shoulder.
19. Plaintiff has been medically written out of work by Dr. Barron since the January 9, 2007 surgery.
20. Plaintiff is not at maximum medical improvement for her various bilateral upper extremity conditions. *Page 7 
21. Dr. Hart is an expert in industrial medicine. He has seen Plaintiff's shade assembler job actually being performed. As Dr. Hart testified, Plaintiff's lampshade assembler job probably substantially aggravated her epicondylitis and is the most likely cause for her bilateral carpal tunnel syndrome. As Dr. Hart further testified, Plaintiff's job duties placed her at an increased risk, over that faced by the general public, of contracting epicondylitis and carpal tunnel syndrome.
22. As Dr. McCloskey testified, Plaintiff's job was a substantial cause of her carpal tunnel syndrome and tardy ulnar palsy, and the job placed Plaintiff at an increased risk of contracting these conditions. As Dr. McCloskey further testified, with her bilateral upper extremity conditions, Plaintiff should not do any job that requires repetitive use of her hands and arms.
23. As Dr. Barron testified, Plaintiff's job caused all of the conditions he has diagnosed in Plaintiff's shoulders except the AC joint arthrosis, which, as Dr. Barron testified, was materially aggravated by Plaintiff's job. As Dr. Barron further testified, Plaintiff's job placed her at an increased risk of developing all of the injuries that he found in Plaintiff's shoulders. As Dr. Barron further testified, Plaintiff is at high risk of re-aggravating her shoulder conditions should she return to any job that involves repetitive use of the upper extremities.
24. To the extent that Dr. Edwards did not testify regarding increased risk and testified that he did not have a strong opinion on causation, the opinions of Drs. Hart, McCloskey and Barron are accorded greater weight by the undersigned. Not only do these doctors outnumber Dr. Edwards, but Drs. McCloskey and Barron are more specialized than Dr. Edwards, and they testified with great confidence in their opinions. *Page 8 
25. Based on the greater weight of the evidence, the Full Commission finds that plaintiff's work for Defendant-Employer placed her at increased risk of developing bilateral carpal tunnel syndrome, epicondylitis/tardy ulnar palsy and bilateral shoulder impingement with rotator cuff tears and labrum tears as compared to the general public.
26. The Full Commission further finds that plaintiff's work for Defendant-Employer was a significant factor in causing her bilateral carpal tunnel syndrome, epicondylitis/tardy ulnar palsy and bilateral shoulder impingement with rotator cuff tears and labrum tears.
27. The medical treatment that Plaintiff has heretofore received for her bilateral upper extremities conditions with Dr. Young, the Hart Industrial Clinic, Dr. Pekman, Dr. McCloskey and Dr. Barron has been reasonably required to effect a cure and/or provide relief for Plaintiff.
28. Further medical treatment for Plaintiff with Dr. Barron is reasonably required to effect a cure, provide relief and/or lessen the period of Plaintiff's disability.
29. Plaintiff's average weekly wage, as determined from the Form 22, which shows earnings of $20, 119.01 for the 52 4/7 weeks prior to the alleged date of onset in this claim, is $382.70. Her compensation rate is $255.15.
 * * * * * * * * * * *
Based upon the foregoing stipulations and findings of fact, the Full Commission reaches the following:
 CONCLUSIONS OF LAW
1. Plaintiff has shown that she contracted compensable occupational diseases in her hands, wrists, elbows and shoulders; to wit, bilateral carpal tunnel syndrome, epicondylitis/tardy ulnar palsy and bilateral shoulder impingement with rotator cuff tears and labrum tears, as a result of her employment with Defendant-Employer. Plaintiff has shown that her employment *Page 9 
substantially caused said conditions and that her employment put her at an increased risk, over that faced by the general public, of contracting said conditions. N.C. Gen. Stat. §§ 97-2(6) and 97-53(13).
2. The instant claim in I.C. No. 571157 is not barred by the release that Plaintiff signed on October 9, 2006. It is clear from the language of the Compromise Settlement Agreement that the parties to said agreement, which did not include Defendant-Carrier in the instant claim, did not intend for said agreement to release Plaintiff's rights to pursue her claim against Defendant-Employer and Defendant-Carrier in the instant claim for injuries and/or occupational diseases that accrued on or after September 1, 2004. The instant claim accrued with an onset date of on or about July 11, 2005, with a new and more severe set of symptoms, with Defendant-Carrier on the risk, and with Plaintiff being last injuriously exposed while on Defendant-Carrier's watch. N.C. Gen. Stat. § 97-57.
3. Defendants have not provided suitable employment to Plaintiff since July 11, 2005, in that the jobs in which Defendant-Employer has placed Plaintiff have worsened her symptoms and not been physically suitable for her. N.C. Gen. Stat. § 97-32
4. Plaintiff has shown that she has been totally disabled since January 9, 2007, the date on which Dr. Barron wrote her entirely out of work because of her shoulder surgery, in that she has been medically unable since then, as a consequence of her compensable conditions, to hold any employment.
5. Plaintiff is entitled to receive temporary total disability compensation from January 9, 2007 through the present and ongoing. N.C. Gen. Stat. § 97-29. *Page 10 
6. Plaintiff is entitled to have Defendants pay for medical treatment for her compensable conditions, both that which she has already received and further treatment. N.C. Gen. Stat. §§ 97-2(19) and 97-25.
7. Defendants should be sanctioned for their failure to file a Form 61 and their failure to file a timely Form 33R. Rule 802.
 * * * * * * * * * * *
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 A W A R D
1. Subject to the attorney's fee provision below, Defendants shall pay to Plaintiff, in a lump sum, back temporary total disability compensation in the amount figured at $255.15 per week from January 9, 2007 through the present. Defendants shall also hereafter pay ongoing temporary total disability compensation to Plaintiff in the amount of $255.15 per week until Plaintiff returns to work or further Order of the Commission.
2. As Plaintiff's attorney's fee, Defendants shall make 25 percent (25%) of the lump sum payment set out in Paragraph 1 above payable directly to Plaintiff's counsel. Said payment is to come out of the lump sum payment and not be in addition thereto. Defendants shall also make every fourth ongoing TTD check payable directly to Plaintiff's counsel.
3. Drs. Barron and McCloskey are hereby designated as Plaintiff's treating physicians, and, subject to the limitations period set out in N.C. Gen. Stat. § 97-25.1, Defendants shall authorize and pay for the treatment that these physicians recommend for Plaintiff's compensable bilateral hands, wrists, elbows and shoulders conditions, including but not limited to referrals, surgery, diagnostic testing, prescriptions and travel. *Page 11 
4. To the extent that Plaintiff and/or any third-party payor has heretofore paid for medical treatment and/or diagnostic testing for Plaintiff's compensable conditions with or at the direction of Dr. Young, the Hart Industrial Clinic, Dr. Pekman, Dr. McCloskey and/or Dr. Barron, Defendants shall reimburse said payor in full.
5. Defendant-Carrier shall pay a fine of $500.00 to the North Carolina Industrial Commission for its failures to file a Form 61 and timely Form 33R in this claim.
6. Defendants shall pay the costs. As part of these costs, Defendants, if they have not done so already, shall pay expert witness fees in the following amounts (or the amount actually billed, if less than the amount set out below): $340.00 to Dr. Edwards; $340.00 to Dr. Hart, and; $510.00 to Dr. Barron. It is noted that, by Order dated January 22, 2007, the undersigned previously set the expert witness fee for Dr. McCloskey.
This the 25th day of March, 2008.
 S/___________________
 DANNY LEE McDONALD
 COMMISSIONER
 CONCURRING: S/_____________ BUCK LATTIMORE
 COMMISSIONER S/_____________ PAMELA T. YOUNG CHAIR *Page 1